## MOORE v. MORRIS.

### Opinion delivered May 17, 1915.

1. DEEDS—QUITCLAIM—INNOCENT PURCHASER.—The mere fact that there is a holding under a quitclaim deed does not defeat the claim of an innocent purchaser. The purchaser may show, notwithstanding the form of the conveyance, that he was in fact without information of any other claim of ownership.

2. ADVERSE POSSESSION—CLAIM OF TITLE—LOSS OF TITLE.—Where D. acquired title to lands by adverse possession, he will be *held* to have lost such title, when he abandoned the same and the land was wild, and the original owner complied with the terms of the Act of March 18, 1899.

3. ADVERSE POSSESSION—WILD LANDS—TITLE.—The Act of March 18, 1899, which applies only to wild lands which are unimproved and uninclosed, *held* not to mean that the lands never have been in any other state, but may apply to improved lands, which have been permitted to return to a state of nature.

Appeal from Clay Chancery Court, Eastern District; *Charles D. Frierson,* Chancellor; reversed.

*Block & Kirsch,* for appellant.

1.   The description in the deed from Schultz to DeMoss was bad and the deed was void. Besides it was never shown that Schultz had title. The deed was not recorded and was not notice. Appellant did not hold under Schultz and was not bound to look for adverse claims. 69 Ark. 95; 76 *Id.* 525; 2 Devlin, Deeds (2 ed.), § § 712, 713; 59 Penn. St. 167-171. The Lester heirs had the paper title and there was nothing to put appellant upon notice or inquiry. Appellant was an innocent purchaser. 69 Ark. 95.

2.   Jesse Morris and Julia A. Brown were barred by the seven-year tax-paying statute and the general statute of limitation. Adverse possession is not shown, but even if DeMoss was ever in possession he would be confined to only that part he actually had in possession his deed being void. 3 Ark. 18; 30 *Id.* 657; 60 *Id.* 487. The land was wild and unimproved. The statute of limitations did not run during the Civil war. 28 Ark. 506.

3.   Appellant is a *bona fide* purchaser for value. He had neither record nor actual notice of any adverse claim.

*Spence & Dudley,* for appellees.

1.   The land was *not* unimproved and unenclosed within the meaning of the law. The rightful owner is deemed in possession until he is ousted or disseized. Possession follows the title in the absence of actual *adverse* possession. 60 Ark. 163; 102 U. S. 333; 73 Ark. 353. There can be only one actual seizure of the same land and at one and the same time.

2.   Appellant was in no way misled or injured by the delay of the true owner to pay the taxes. Laches can not be charged against appellees. 99 Ark. 506; 92 *Id.* 407; 102 *Id.* 60.

3.   The true owner of land can not be divested of title by the mere failure to pay taxes and the enhancement in value. 99 Ark. 500.

4. Appellant was not an innocent purchaser. 4 Words & Phrases, 3628; 95 *Id.* 582; 76 *Id.* 25; 77 *Id.* 309; 49 *Id.* 207; 55 *Id.* 47. Moore purchased with notice (76 Ark. 27) both actual and constructive.

5. He was put on notice by accepting a quitclaim deed. Warvelle on Abstracts of Title, 219.

6. The deed to DeMoss was not void. The testimony shows it was a warranty deed regularly executed, acknowledged and recorded. The record was burned. The only defect in the abstract was the use of the word "east," instead of north. Courts take judicial knowledge of the U. S. system of land surveys, (88 Ark. 52; 34 Ark. 227; 68 *Id.* 561),' and that township 21, in range 6 east is in Clay County. The error was that of the recorder of deeds.

7. There is no such thing in Arkansas as losing title by abandonment, unless accompanied by estoppel and limitation. 105 Ark. 667.

McCulloch, C. J. This controversy concerns the title of a tract of land in Clay County, Arkansas, containing eighty acres and described as the east half of the northeast quarter, section 18, township 21 north, range 6 east. Appellant has a clear paper title. The land was patented by the United States to the State of Arkansas July 5, 1856, and the State in turn patented to P. K. Laster and T. J. Melon. Melon quitclaimed to Lester and the heirs of the latter, who died intestate in the year 1877, sold and conveyed the land to appellant in February, 1911. Appellees claim title under their ancestor, Louis DeMoss, and attempt to prove that the latter acquired title by adverse possession. They instituted this action at law to recover the possession of the land from appellant, and on the latter's motion the cause was transferred to equity where he filed a cross-complaint asking that his title be quieted. Appellees undertook to show that a conveyance was executed by one Schultz to De-Moss dated March 10, 1852, and actual occupancy of the land by DeMoss for a period of more than seven years. The proof shows that DeMoss entered upon the land in the year 1862 and built a house thereon and cleared and

put in cultivation a considerable portion of the land, the quantity varying, according to the testimony of witnesses, from twenty-five to sixty acres. He lived on the land until his death, which occurred in 1869, and was buried there in a private burying ground. His widow married again, but continued to occupy the land and rent it out to tenants until she died in 1873, and the land was controlled by a guardian of one of the heirs, who was a minor, for several years thereafter. The land was subsequently abandoned—the exact time is not shown in the record—and the house was destroyed by fire, the fences rotted down and became obliterated, and the cleared lands grew up again. The land remained in that condition until about 1905 or 1906 when a man by the name of Sharp purchased a small tract adjoining this land and in clearing it up got a few acres over the line. After Sharp left the place, a man named Phillips, with his family, moved into the house in 1907 and continued to enlarge and fence the clearing on the land in controversy. At the time appellant purchased the land from the Lester heirs, Phillips' widow was occupying it; that is to say, she was living in the house on the adjoining Sharp land and was cultivating the newly cleared land on the place in controversy. There is a controversy as to the amount of the cleared land at that time. The testimony adduced by appellant tends to show that there were only nineteen acres, but the testimony adduced by the other side tends to show a much larger quantity. Neither Phillips nor his wife asserted any title to the land and never attorned to anyone as landlord until after the purchase by appellant, when Mrs. Boyd (formerly Mrs. Phillips) attorned to appellant and executed to him a rental contract for the year 1911. Phillips and his wife were mere "squatters" on the land, and, as before stated, asserted no claim of ownership. About two weeks before appellant purchased the land from the Lester heirs, he went to see the occupant, Mrs. Boyd, and she told him that she was not asserting any claim to it, but said that she had as much right to it as anyone else. Thereupon he went over to another county where the Lester heirs lived and

made the purchase for the sum of a thousand dollars. One hundred dollars was paid in cash and the remainder was paid on a subsequent date. The Lester heirs executed to appellant a special warranty deed, which was subsequently lost or destroyed, and a quitclaim deed was then executed.

Appellant testified that at the time he made the purchase he had no information whatever that appellee or anyone else made any claim to the land or that there had ever been any occupancy of the land by DeMoss. He is corroborated in this by other witnesses. One of the Lester heirs testified that he had never heard of the DeMoss heirs asserting any claim to the land until after it was sold to appellant, or that the land had ever been occupied by DeMoss.

The testimony shows clearly that as far back as the year 1898 all the improvements on the land had been destroyed and that it had grown up with timber. In other words, it had returned to its wild state of nature, leaving very little evidences of any improvements ever having been made. The testimony adduced by appellees does not tend to show that any claim was asserted by the DeMoss heirs until after the purchase by appellant, nor does it show that appellant had any information that there was a claim made by the DeMoss heirs except that Mrs. Boyd testified that when appellant came to see her about the land he showed her a deed and said that it was a deed from the DeMoss heirs. This, however, was contradicted and we think the preponderance of the testimony is against the conclusion that appellant made any such statement to Mrs. Boyd. The evidence establishes clearly the fact, we think, that appellant was entirely innocent of any knowledge or information that there was an adverse claim to the land at the time he made the purchase from the Lester heirs. The tax receipts exhibited in the record show that the Lester heirs paid the taxes on the land continuously from the year 1892 up to the time the sale was made to appellant. One of the heirs testified that Lester had always paid taxes on the land, but there is no evidence of it in the way of tax re-

ceipts exhibited prior to the year 1892. It seems that the record of Clay County was destroyed by fire that year. All the records, including the records of deeds, were destroyed. The only evidence of the alleged conveyance from Schultz to DeMoss is that deduced from the books of an abstracter of titles. There was no official record, in other words, showing this deed. The abstract books contain a notation indicating that there was an error in the description as to the particular township, indicating that the record showed the township to be 21 *east*. The abstracter testified that from his recollection in copying the abstract, and from what he could infer from the notation, the range number was correct but that there was a clerical error in the record of the township number.

(1-2-3) It may be conceded (without so deciding) that appellees have made sufficient showing to establish title in their ancestor by adverse possession under color of title; nevertheless, the testimony shows very clearly that appellant is entitled to have a decree quieting his title and declaring his right of possession. This results upon two distinct grounds. In the first place, appellant was an innocent purchaser for value. According to the undisputed testimony, the occupancy of the heirs of De-Moss had been abandoned several years prior to the year 1887. The testimony of a witness who described the condition of the land during that year shows that the part formerly in cultivation had been entirely abandoned and was an old, thrown-out field, with no buildings of any kind on it, or fences. He stated that all evidences of fences had been obliterated. The land was then growing up, and witnesses who describe it at different periods thereafter show that it grew up completely. The condition, as described by a witness, in the year 1898 was that it was grown up then in timber, and those who describe it up to the years 1905 or 1906, when Sharp began clearing up a little of it, was that it was in its original wild state, leaving very little evidences of former cultivation. Some of the witnesses say that there were a few fruit trees on the land and occasional evidences of the land having once been in cultivation, but that to the ordinary

observer it was in a wild state, covered with timber. Appellant had no notice of the claim of the DeMoss heirs, either actual or constructive. Even if the record of the deed from Schultz to DeMoss (which was not in the line of appellant's title, and notice of which could not be chargeable against him, *Turman* v. *Sanford,* 69 Ark. 95), could ever have been treated as constructive notice of the DeMoss claim, the record had been destroyed by fire in the year 1892, and, the occupancy by the DeMoss heirs having been completely abandoned, there was nothing whatever to constitute constructive notice of the DeMoss claim. The evidence is quite convincing that neither the Lester heirs nor appellant had any intimation whatever that DeMoss or his heirs had ever occupied the land or that the heirs were making any claim of title. Learned counsel for appellees rely upon the fact of appellant holding under a quitclaim deed as charging him with notice of defects in the title. That contention, however, is unsound for this court has decided that the mere fact that there is a holding under a quitclaim deed does not defeat the claim of an innocent purchaser. That fact is merely considered as a circumstance in determining whether or not the purchaser was in fact innocent of knowledge of any adverse claim, but the purchaser may show, notwithstanding the form of conveyance, that he was in fact without any information of any other claim of ownership. *Miller* v. *Fraley,* 23 Ark. 735; *Brown* v. *Nelms,* 86 Ark. 368. All of the records and all the circumstances in this case tend to support appellant's claim that he purchased the land in good faith, relying upon the fact that his grantors had the record title, and without any notice that there were any adverse claims. There is, it is true, evidence to the effect that some people living in the neighborhood had information of the original DeMoss occupancy, and that the DeMoss heirs would or could assert a claim of ownership, but it was not information so notorious that appellant is presumed to have known about it, and there is no evidence that he did in fact know of it. The land was in a wild state and the Lester heirs were paying taxes on it from year to year and

they had the record title. We are of the opinion, therefore, that appellant fully made out his claim of an innocent purchaser and that the decree should have been in his favor on that ground. The occupancy of Phillips and his wife was without any claim of ownership and therefore was not sufficient to put appellant upon notice that there were any adverse claimants.

We are of the opinion, also, that even if DeMoss or his heirs acquired title by adverse possession, that title was reacquired by the original owners, the Lester heirs, by payment of taxes under color of title under the Act of March 18, 1899.* The undisputed evidence is that Lester and his heirs paid taxes on the land continuously up to the time it was sold to appellant. Their paper title, which constituted absolute title up to the time the ownership was wrested from them, if at all, by the adverse occupancy of DeMoss, continued thereafter at least as color of title, and the payment of taxes while the land was in a wild state and unoccupied restored the title to them by adverse possession according to the terms of the statute. The lands were, according to the testimony, wild and unoccupied within the meaning of the Act of 1899, at least from the year 1898 up to the year 1905 or 1906, when Sharp commenced clearing over the line. Three payments were therefore made after the passage of the Act of 1899. The statute applies only to "unimproved and uninclosed land;" that is to say, land that is wild and in a state of nature. This does not mean, however, that the lands must never have had any other status, for improved lands may be permitted to return to a state of nature. The statute relates to the condition of the lands at the time the payment of taxes is made under color of title, regardless of the former state of the lands; and if at that time they are unimproved and uninclosed, that is to say in a wild state as before the improvements were first made, then they fall within the terms of the statute and such payments amount to occupancy which will in

---

*Act No. 66, p. 117, Acts 1899.

course of time ripen into title by limitation. *Fenton* v. *Collum,* 104 Ark. 624.

The decree of the chancellor is therefore reversed and the cause is remanded with directions to enter a decree for appellant in accordance with this opinion.